# MARCUS ANGELO BOONE *v.* STATE OF MARYLAND

[No. 227, September Term, 1977.]

*Decided March 8, 1978.*

The cause was argued before MOYLAN and MASON, JJ., and JAMES F. COUCH, JR., Associate Judge of the Seventh Judicial Circuit, specially assigned.

*Geraldine Kenney Sweeney, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Stephen Rosenbaum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Bruce C. Spizler, Assistant Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *F. Anthony McCarthy, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MASON, J., delivered the opinion of the Court.

Appellant, Marcus Angelo Boone, was convicted at a bench trial in the Circuit Court for Prince George's County of receiving stolen goods (two counts). On appeal he contends, among other things, that the trial court erred in denying his motion to suppress evidence seized during the warrantless search of his apartment.

On August 10, 1975, Stephen Philip Mach, a member of the Prince George's County Sheriff's Department assigned to the Eviction Squad, went to appellant's residence, 7711 Hawthorne Street, Apartment 301, to execute a warrant of restitution, which stated:

> Whereas at the trial of this case in this Court, judgment was rendered in favor of the Plaintiff (landlord) for possession of the premises, described as 7711 Hawthorne Street, #301, Landover, Maryland 20785.
>
> Now therefore, I do command you forthwith to deliver to the said plaintiff (landlord) possession of the said premises. Issued this 3rd day of August, 1976.

The statutory provision governing this procedure directs the sheriff

> to cause the landlord to have again and repossess the property by putting him (or his duly qualified agent or attorney for his benefit) in possession thereof, and for that purpose to remove from the property by force, if necessary, all the furniture, implements, tools, goods, effects or other chattels of every description whatsoever belonging to the tenant, or to any person claiming or holding by or under said tenant.

Md. Real Property Code Ann. § 8-401 (d).

According to Deputy Mach:

> After checking in at the rental office and ascertaining that the rent in question had not been

paid, I proceeded to the apartment site with the resident manager and a crew of movers. I knocked on the door. There was no answer. We unlocked the doors and entered the apartment. I searched the premises for contraband, money, weapons, things that we normally don't put out on the street.

Mach testified that his search of the premises was done pursuant to a standard Prince George's County Sheriff's Department policy not to put contraband, intoxicants and weapons on the public street. On cross-examination, he further described this procedure:

Q. In other words, to find what you considered to be contraband material, what kinds of items do you look into in order to find these items of contraband materials? In other words, do you go through people's drawers, closets, boxes?

A. Yes, sir.

Q. If they have any packages in the apartment, would you also look through the packages in order to see what was inside?

A. In some cases, I would.

Q. Is that what was done in this case?

A. Yes.

Q. Were the drawers, for example, and dressers and chests opened and searched?

A. Always; standard procedure.

* * *

Q. What would you do with the items which were not contraband, such as, let's say, credit cards and checks and personal papers that belonged to the occupant of the apartment? Where would those go?

A. If they belonged to the occupant, I would put them in a dresser drawer or a box or a bag and remove them.

Q. And they would go out on the street?

A. Yes, sir.

* * *

Q. [A]re there some items which you would hold for the owner?

A. Yes, sir. That would be handguns, jewelry, weapons, things that you don't put out on the street because they would be a health hazard or dangerous.

During the search of the premises before the property was removed from the apartment and placed on the street, Mach found next to the bed a small cardboard box containing some papers. At the bottom of the box he observed a checkbook which he removed and discovered it contained several identification cards and other items belonging to one Gale Acevedo. In a walk-in closet in the bedroom, Mach found several credit cards belonging to Patrick J. Flynn, Robert C. Masterson and appellant. Mach could not remember exactly where in the closet he found the credit cards, but did testify, "They may have been on the floor or on the ledge or in the pockets. Occasionally I go through clothes too."

After obtaining the telephone number of Gale Acevedo from some of the items found, Mach telephoned her. She informed him that her purse had been stolen and some of the recovered items had been reported to the police as stolen. Mach then contacted the police and turned all of the items of Acevedo, Flynn and Masterson over to them.[1] Mach admitted that at the time he found this property, he did not know that it had been stolen.

The trial court, in denying appellant's motion to suppress, held:

We can, first of all, say that there is no Fourth Amendment problem with regard to a search in that by failing to pay rent Marcus Boone both forfeited his rights in the premises and then the justifiable expectation of privacy that he may have had in the premises, . . .

But, not even looking on it in that vein, the question is whether Sheriff Mach engaged in either an unreasonable search or unreasonable seizure. Certainly, executing a valid warrant of restitution is

1. At trial a motion for judgment of acquittal was granted as to the Acevedo items because there was insufficient evidence that the items had been stolen, but denied as to the Masterson and Flynn items.

in no way, shape or form a search. Secondly, with regard to any seizure, ... [t]he officer is commanded to pick up and put out on a public street each and every items that belonged in that premises. So there is certainly not a seizure problem.

. . .

We feel the activities of the officer, first of all, in determining the character of each and every item he finds there so that he can exercise a different caretaking function depending on the nature of the item is not only sanctioned, it is to be condoned and certainly we feel that the actions of Officer Mach were not improper in any way, shape or form and certainly not violative of any Fourth Amendment right.

## THE FOURTH AMENDMENT

The threshold question to be answered is whether the search of appellant's apartment and the seizure of the credit cards comes within the ambit of that part of the Fourth Amendment of the United States Constitution, which provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures should not be violated."

The criteria for testing the applicability of the fourth amendment was enunciated by Mr. Justice Harlan in a concurring opinion in *Katz v. United States,* 389 U. S. 347, 361 (1967):

As the Court's opinion stated, "the Fourth Amendment protects people, not places." The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a "place." My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to

recognize as "reasonable". Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited.

*See Venner v. State,* 279 Md. 47, 51-52 (1977). Simply stated, applying this test to the facts here, if appellant had a reasonable expectation of privacy in the seized credit cards, the fourth amendment applies; if he did not, then the fourth amendment does not apply and "questions of probable cause, exigency and reasonableness are totally irrelevant." *Venner v. State,* 30 Md. App. 599, 611 (1976) *aff'd,* 279 Md. 47 (1977).

The State contends that appellant had no reasonable expectation of privacy in the premises because "the judgment in the landlord's favor, which precipitated the warrant of restitution, terminated any property interest appellant may have had in the premises." In support of this contention and in ostensible reliance on *United States v. Cowan,* 396 F. 2d 83 (2d Cir. 1968), the State reasons that the present case is analogous to those cases where the courts have uniformly held that a hotel guest who fails to pay his room rent forfeits his right to occupy the room and any right of privacy therein. *E.g. United States v. Parizo,* 514 F. 2d 52, 55 (2d Cir. 1975); *State v. Roff,* 70 Wash. 2d 606, 424 P. 2d 643, 646-47 (1976).

In *Cowan* the defendant failed to pay his hotel bill and the manager removed all his personal effects and luggage to the hotel office. Later with the manager's consent, two F.B.I. agents examined the luggage and its contents, apparently finding incriminating evidence. Cowan contended that the search and seizure of his luggage were unlawful. The Court held:

Here there was no invasion of Cowan's right to privacy. He had lost his right to use the room and with this the law gave the hotel the right to seize the property. . . . [I]t is clear that by leaving the luggage in the room and failing to pay his bill, Cowan forfeited the right to occupy the room undisturbed

26

and, as to the luggage, the right to retain possession and any claim to privacy concerning it and its contents.

396 F. 2d at 86-87. The Court further observed that Cowan's luggage and its contents were in legal possession of the hotel pursuant to a statutory lien for unpaid rent. Therefore, it could be examined, inventoried, and sold at public auction. *Accord, United States v. Croft,* 429 F. 2d 884, 887 (10th Cir. 1970). We think the case of *United States v. Cowan* and the hotel cases adverted to are markedly different from the case at bench.

A careful reading of those cases shows that because of a hotel keeper's lien [2] or the transitory nature of the tenancies and rental arrangements, mere nonpayment of the rent terminates any reasonable expectation of privacy in the hotel room and the property contained therein.

The manager of the motel may then freely enter the room, rent the room to others, and remove any belongings left in the room. These belongings may be retained and eventually sold by the motel to pay back rent. Since after the rental period expires a guest has no right of privacy, there can be no invasion thereof.

*United States v. Croft, supra,* 429 F. 2d at 887. Pursuant to this exclusive use, possession and control, the hotel manager can give consent to search the room and anything therein. *State v. Carrillo,* 26 Ariz. App. 113, 546 P. 2d 838 (1976). In the present case, the execution of the warrant of restitution returned only the possession and control of the apartment to the landlord, and unlike *Cowan,* the landlord here did not acquire any proprietary interest in appellant's personal effects. Thus, he could neither search nor consent to a search of these effects. Although appellant's nonpayment of rent and the landlord's compliance with the statutory requirements to repossess the apartment may have terminated appellant's expectation of privacy in the

2. See Md. Commercial Law Code Ann. § 16-502.

apartment, he still retained a legitimate and justifiable expectation of privacy in his personal effects, diminished only to the extent of the intrusion necessary for the removal of these effects.

In *United States v. Chadwick,* 433 U.S. 1, 53 L.Ed.2d 538, 550 n.8 (1977), the Supreme Court discussed a defendant's privacy expectation in a footlocker that had been seized by the police:

> Respondent's principal privacy interest in the footlocker was of course not in the container itself, which was exposed to public view, but in its contents. A search of the interior was therefore a far greater intrusion into Fourth Amendment values than the impoundment of the footlocker. Though surely a substantial infringement with respondent's use and possession, the seizure did not diminish respondent's legitimate expectation that the footlocker's contents would remain private.

*See also Waine v. State,* 37 Md. App. 222, 231 (1977). We believe appellant's expectation of privacy in his personal effects was at least equal to Chadwick's expectation of privacy in his footlocker.

In *People v. Stadtmore,* 52 App. Div. 2d 853, 382 N.Y.S.2d 807 (1976), a case similar to the case sub judice, a warrant to evict was issued because of the defendant's nonpayment of rent. On the date the warrant was to be executed the marshal, aware of the defendant's criminal background, requested police assistance. When the marshal, accompanied by two detectives and the building superintendent, arrived at the defendant's apartment he had almost finished packing. As the defendant was completing his packing, the two detectives, although not looking into the packed boxes, thoroughly searched the apartment. While looking under the stove, one of the officers found narcotics underneath the broiler. The defendant challenged the legality of the search and the prosecution responded as follows:

> (1) the relationship of landlord and tenant terminated upon the issuance of the warrant to evict;

(2) even if the defendant had a possessory interest in the apartment on September 16, 1974, he had no reasonable expectation of privacy for the simple reason that he knew the City Marshal would be evicting him; and (3), in any event, the two police officers had a right to be in the apartment and the two bottles were in plain view.

382 N.Y.S.2d at 809. In reversing the conviction, the Court held:

Until the moment of his actual eviction defendant, regardless of his technical status under property law, was lawfully occupying the apartment in question. In our view, respondent seeks to convert civil process into a warrant for a general search. In short, the single fact of nonpayment of rent should not result in the forfeiture of one's Fourth Amendment rights.

. . . In terms of reasonable expectations, we do not believe that a tenant who is about to be evicted should anticipate that police officers will be present to conduct a general search for contraband on the pretense of insuring the total removal of his belongings, nor does the plain view doctrine have any application to this case for the simple reason that the bottles were *not,* in fact, in plain view.

382 N.Y.S.2d at 810. (Emphasis in original).

## THE SEARCH

Since we find that appellant had a reasonable expectation of privacy in his personal belongings, the Fourth Amendment clearly applies to the challenged search and seizure. This finding does not end our inquiry, however, because the Fourth Amendment only proscribes unreasonable searches and seizures. *United States v. Chadwick,* 433 U. S. 1, 53 L.Ed.2d 538, 547 (1977); *South Dakota v. Opperman,* 428 U. S. 364, 375 (1976).

The State argues, in essence, that the search and seizure were reasonable because the deputy sheriff was exercising

a community caretaking function pursuant to a departmental policy of not putting guns, intoxicants, contraband, and jewelry on the public street during the course of an eviction. In considering whether this policy, which we believe to be analogous to an inventory search, is reasonable or an impermissible intrusion on fourth amendment values, we look to the rationale developed by the courts in upholding inventory searches. *See e.g., South Dakota v. Opperman, supra; Duncan and Smith v. State,* 281 Md. 247 (1977); *Waine v. State,* 37 Md. App. 22 (1977). The Supreme Court in *South Dakota v. Opperman, supra,* lucidly explicated the inventory search rationale:

> In the interests of public safety and as part of what the Court has called "community caretaking functions," automobiles are frequently taken into police custody. . . .
> When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger. The practice has been viewed as essential to respond to incidents of theft or vandalism. In addition, police frequently attempt to determine whether a vehicle has been stolen and thereafter abandoned.

428 U. S. at 368-69. (Citations omitted). The Supreme Court held that these searches were routine, non-investigative police inventories and were reasonable. In *Duncan and Smith v. State, supra,* 281 Md. at 259, the Court of Appeals held:

> [P]olice may, without regard to probable cause, and, thus, absent a warrant, constitutionally enter an automobile and unlocked compartments therein, and inventory and seize articles found, provided the vehicle had been otherwise legally taken into police

30

custody and the inventorying was pursuant to a standard police procedure.

In *Waine v. State, supra,* 37 Md. App. at 232-33, this Court extended the scope of the inventory search rationale:

We see no reason why in an appropriate case an inventory search would not be as applicable to luggage as to automobiles, if the reasons for the station house inventory are as valid as the justifications for an automobile inventory.

These cases teach that the purpose of the inventory search is: one, to protect the owner's property while it is in police custody; two, to protect the police from danger; and three, to protect the police from disputes over lost or stolen property. The cases also teach that an inventory search must be conducted in a non-investigative manner, as part of a standard, routine procedure and not conducted to discover evidence of crimes. In *Cady v. Dombrowski,* 413 U. S. 433 (1973), the defendant challenged the admissibility of certain incriminating evidence found in his car. There, the police searched the car, impounded on an unguarded lot, because they believed that the service revolver of the defendant, a police officer, would be found. The Supreme Court found that the search was reasonable, not on the grounds of an inventory search, but because of "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." 413 U. S. at 447.

In this case we have no problem with equating the purpose of the sherriff's departmental policy in not putting dangerous or valuable items belonging to an evicted tenant on the public street with the inventory search rationale and the concern for the safety of the public, provided, of course, that the search for these items is no more intrusive than necessary to effectuate the limited purpose of the policy. Under the facts here, we believe this search exceeded the purpose of the departmental policy. Manifestly, there was no necessity for Mach, while rummaging through appellant's personal effects (purportedly to place dangerous and valuable items in protective custody) to read the credit cards, upon which the

convictions here rest. In *Waine v. State, supra,* this Court held that the inventory of the contents of a suitcase did not require the police to search through and read papers contained therein. 37 Md. App. at 234.

A similar limit on the scope of an inventory search was imposed in *United States v. Edwards,* 554 F. 2d 1331, 1338-39 n. 12 (5th Cir. 1977):

> Perhaps the greatest intrusions upon protected privacy that would result from eliminating the limits on inventory searches involve the reading of papers carried in the car. Such prospects weighed heavily in Justice Powell's insistence that limits be imposed. *See South Dakota v. Opperman,* 428 U.S. 364, 380 n. 7, 96 S. Ct. 3092, 49 L.Ed.2d 1000 (1976) (Powell, J. concurring). He noted that there the police found " 'miscellaneous papers,' a checkbook, an install-ment loan book, and a social security status card," but he emphasized that there was no showing that the police examined the contents of such items. The police merely removed them for storage. *Id.* Here, in contrast, the police read the seized checks and read the identification cards found on the front seat. The inventory rationale provides no warrant for doing so. Thus, even if the inventory theory allowed looking beneath the carpeting — which it did not — the police would not have been entitled to read the checks absent probable cause and exigent circumstances. The police are of course free to recognize items that appear to be government checks. Finding items that even without being read could probably be identified as checks might well have given the police probable cause under the circumstances here. Finding cards on the front seat, however, would not have. The officers were not entitled to read the cards, and the contents of the cards therefore cannot buttress the government's probable cause theory. . . .
>
> Our emphasis on the privacy expectations that inhere in papers should not be taken as an indication

that inventory search limitations protect only papers. It is impossible to catalog in advance all the purveyors of intimate details about a person. The fourth amendment requires that inventory searches go no further than necessary to effectuate the limited goals that give rise to this narrow exception to the warrant requirement.

We believe that the limit expressed in *Edwards,' supra,* as to the reading of one's personal papers in an inventory search applies even more strongly in the present case.

It is apparent that Mach was not only performing a community caretaking function; he was also conducting a general investigative search for evidence of crime. Obviously his conduct was inconsistent with the purpose of the departmental policy. Deputy Mach should have instantly and easily recognized the credit cards as not being the type of items contemplated for protective custody, therefore, his search was constitutionally impermissible.

Additionally, we agree with the argument of appellant that the seizure of the credit cards was unreasonable. In *State v. Wilson,* 279 Md. 189 (1977), the Court of Appeals recently discussed the law relating to warrantless seizures. In that case, while executing a valid search warrant for narcotics, one of the officers observed twenty to twenty-five electrical appliances, such as televisions and stereos, in one of the rooms. He "looked over" these items and "jotted down the serial numbers for all of them." *Id.* at 192. The officer later checked the serial numbers through a national computer system which lists stolen equipment and found one of the items to be stolen.

The State sought to justify the warrantless seizure of the serial numbers on the grounds of the "plain view" exception to the warrant requirement. Quoting from *Coolidge v. New Hampshire,* 403 U. S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971), the Court summarized the "plain view" exception:

This doctrine serves to supplement a previously justified intrusion, such as a search warrant for other property, and permits a warrantless seizure.

> The exception, on the other hand, may not be used to expand a justified, but limited, intrusion into a general exploratory search of a person's belongings until something incriminating at last emerges. To confine the exception within these boundaries, the Court prohibited the use of any evidence seized outside the warrant unless (1) the police have a prior justification for the intrusion; (2) they find the evidence in plain view; (3) they find it inadvertently; and (4) it is "immediately apparent to the police that they have evidence before them."

279 Md. at 194-95. (Citations omitted). The Court noted that the fourth requirement "amounts to a requirement that the police have probable cause to believe the evidence is incriminating before they seize it." *Id.* at 195. The Court concluded the police did not have probable cause, and that "the record justifies no more than a mere suspicion that any of the goods were stolen," and held that the seizure was not justified. *Id.* at 197.

We think *Wilson* is dispositive of this issue. Mach clearly did not have probable cause to believe the credit cards were incriminating before he seized them. In fact, he testified that he had no knowledge that the cards were stolen. The presence of credit cards bearing several different names creates "no more than a mere suspicion that any of the [credit cards] were stolen." Like *Wilson,* the incriminating nature of the evidence became apparent only after the seizure. Accordingly, we find that the seizure was illegal.

Because we find that the search and seizure in this case were illegal, we need not address the additional issue raised by appellant concerning the State's amendment to the charging document. The seized credit cards were the crucial evidence, without which appellant could not have been convicted. There is no basis for a retrial. *Gray v. State,* 254 Md. 385 (1969).

> *Judgments reversed.*
> *Costs to be paid by Prince George's*
> *County.*