# STATE OF MARYLAND *v.* MARCUS ANGELO BOONE

[No. 20, September Term, 1978.]

*Decided November 16, 1978.*

*Stephen Rosenbaum, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General,* and

*Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellant.

*Geraldine Kenney Sweeney, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court. COLE, J., filed an opinion dissenting in part and concurring in part at page 18 *infra.*

On our review of the judgment of the Court of Special Appeals upon grant of the State's petition for the issuance of a writ of certiorari, we agree with the claim of Marcus Angelo Boone, as did the intermediate appellate court on direct appeal, that his convictions in the Circuit Court for Prince George's County of two offenses of receiving stolen goods resulted from an unreasonable seizure prohibited by the Fourth Amendment to the Constitution of the United States.[1] We therefore affirm the judgment of the Court of Special Appeals, with modification as hereinafter set forth, which reversed the judgments of the circuit court. *Boone v. State,* 39 Md. App. 20, 383 A. 2d 412 (1978).

## I

Boone was found guilty in the circuit court[2] upon two arrest warrants which, as amended, charged him with receiving stolen goods under the value of $100 as proscribed by Md. Code (1957, 1976 Repl. Vol.) Art. 27, § 467 (a). Warrant no. 95493 alleged that he had received goods stolen from Jeanne A. Flynn and warrant no. 95494 alleged that he had received goods stolen from Robert C. Masterson.[3] The

---

1. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U. S. Const., amend. IV. *See* Mapp v. Ohio, 367 U. S. 643, 81 S.Ct. 1684 (1961).

2. In the District Court, Boone demanded a jury trial, depriving that court of jurisdiction. Md. Code (1974) § 4-302 (d) of the Courts and Judicial Proceedings Article.

3. Boone also went to trial under warrant no. 95495 alleging that he had received goods to the value of $14 stolen from Gale Shaver Acevedo. It

4

warrants were issued on the application of Private T. P. Lennon of the Prince George's County Police Department. It came about in this manner.

The Legislature has provided that "[w]henever the tenant under any lease of property, express or implied, verbal or written, shall fail to pay the rent when due and payable, it shall be lawful for the landlord to have again and repossess the premises so rented." Md. Code (1974) § 8-401 (a) of the Real Property Article. The procedural requirements for a trial on the matter in the District Court of the county wherein the property is situated, are spelled out in § 8-401 (b). If judgment is given in favor of the landlord, § 8-401 (c) (2), and the tenant fails to comply with an order to yield and render possession of the premises to the landlord within two days after the trial, § 8-401 (c) (3), "the court shall, at any time after the expiration of the two days, issue its warrant, directed to any official of the county entitled to serve process, ordering him to cause the landlord to have again and repossess the property by putting him . . . in possession thereof, and for that purpose to remove from the property, by force if necessary, all the furniture, implements, tools, goods, effects or other chattels of every description whatsoever belonging to the tenant, or to any person claiming or holding by or under said tenant. If the landlord does not order a warrant of restitution within sixty days from the date of judgment or from the expiration date of any stay of execution, whichever shall be the later, the case shall be considered as dismissed." § 8-401 (d). *See* amendment, Acts 1978, ch. 450.

Boone rented an apartment in Prince George's County and, upon his failure to pay the rent when due, appropriate proceedings pursuant to § 8-401 were instituted in the District Court of Maryland in that county, and trial was had. Upon judgment rendered in favor of the landlord, a warrant of restitution was duly issued commanding the Sheriff "forthwith to deliver" to the landlord possession of the premises. It was during the execution of this warrant by

appeared at trial that the goods was Ms. Acevedo's checkbook. The court granted Boone's motion for judgment of acquittal on this charge because the State did not prove that the checkbook had been stolen.

Stephen Philip Mach, Deputy Sheriff of Prince George's County, that the goods which Boone was found to have received unlawfully were found. The goods consisted of three credit cards in the name of Flynn and a credit card in the name of Masterson. The circumstances under which they were found and Mach's actions thereafter were recounted by him during a pretrial hearing in the circuit court on a motion to suppress evidence.

Mach, accompanied by a crew of movers, went to the building in which Boone resided. After determining at the rental office that the rent due had not been paid, he went to Boone's "top-floor standard one-bedroom apartment," with the movers and the resident manager. He testified: "I knocked on the door. There was no answer. We unlocked the doors and entered the apartment. I searched the premises for contraband, money, weapons, things that we normally don't put out on the street." The search was thorough. It included going through closets, furniture drawers, clothing and boxes. Mach characterized such a search as "standard procedure," but the authority for it and the limitations on its scope, if any, were not fully disclosed. Whether it was pursuant to rule, regulation, directive or direction of the Sheriff, or simply Mach's method of operation does not appear in the record before us. Mach indicated that there were some items which he would "hold for the owner." He explained: "That would be handguns, jewelry, . . . weapons, things that you don't put out on the street because they would be a health hazard or dangerous." [4] Asked specifically about checks, credit cards and personal papers belonging to the occupant of the premises, he said: "If they belonged to the occupant, I would put them in a dresser drawer or a box or a bag and remove them." They would go out on the street with the other articles in the apartment. Mach searched the bedroom last, after he had searched the living room and kitchen. He found the credit cards in a walk-in closet in the bedroom. He was not sure of the exact location of the cards. "They may have been on the

---

4. Mach did not explain why placing "jewelry" on the street would be "dangerous" or constitute a "health hazard."

floor or on the ledge or in the pockets [of clothes]." [5] The Acevedo checkbook with other papers was in a small cardboard box beside the bed. He seized the credit cards and checkbook and then had the remaining contents of the apartment removed to the street.

At the time Mach seized the credit cards and checkbook he did not know that they had been stolen. He subsequently called Ms. Acevedo, whose telephone number and address were listed on the checkbook, "[t]o find out if it was stolen." Ms. Acevedo informed Mach that the checkbook had been stolen and that Lennon was the investigating officer. Mach then contacted Lennon who said he would ascertain whether there were any outstanding reports of thefts from Flynn or Masterson. It seems that Flynn had reported the thefts, but there had been no report to the police of the theft of the Masterson credit card at the time Mach seized it. Mach turned the credit cards and checkbook over to Lennon. The trial court denied the motion to suppress, and the items Mach seized were received in evidence during trial on the merits.

## II

The State would invoke the doctrine of abandonment to justify the seizure of the evidence. We have recognized that "[w]ithout question, abandoned property does not fall within that category in which one has a legitimate expectation of privacy to bring it within the protection of the Fourth Amendment, but whether property is abandoned is generally a question of fact based upon evidence of a combination of act and intent." *Everhart v. State,* 274 Md. 459, 483, 337 A. 2d 100 (1975). In *Venner v. State,* 279 Md. 47, 51-52 and 59, 367 A. 2d 949, *cert. denied,* 431 U. S. 932 (1977), we adopted and applied the criteria for testing the Fourth Amendment's applicability enunciated by Mr. Justice Harlan in his

---

5. Mach also found two cards in the name of Boone, a Maryland Medical Assistance Program card and a temporary identification card issued by the State Social Services Administration.

concurring opinion in *Katz v. United States,* 389 U. S. 347, 361, 88 S. Ct. 507 (1967):

> "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' Thus a man's home is, for most purposes, a place where he expects privacy. . . ."

We have also noted that one of the exceptions to the general rule, that a search of private premises should be pursuant to a legally issued warrant, permits the search of a dwelling unit which has been vacated and abandoned by its former occupants. *Buettner v. State,* 233 Md. 235, 239, 196 A. 2d 465 (1964). In other words, "one who abandons or discards property cannot complain with effect of the later seizure of such property by the police, or of its use against him in court." *Henderson v. Warden,* 237 Md. 519, 523, 206 A. 2d 793 (1965). *See Matthews v. State,* 237 Md. 384, 387-388, 206 A. 2d 714 (1965). The Deputy Sheriff was lawfully on the premises by virtue of the duly issued warrant of restitution. But he was there for one purpose, to enable the landlord to have the premises again. To accomplish this, the Deputy Sheriff had statutory authority to remove all the goods on the premises. His duties with respect to the goods, as far as the record before us shows, ordinarily ended when he removed them from the premises. They were simply placed on the street at the risk of the tenant. The Deputy Sheriff was concerned, however, and with sound cause, we think, about placing on the street contraband and goods which "would be a health hazard or dangerous." In order to prevent this, it was "standard procedure" to search for such items before clearing the premises, and, apparently, when such articles were found, they would be taken into custody. We need not decide whether, in such circumstances, a search of the premises is constitutionally proscribed as unreasonable. Nor need we decide if it would be unreasonable to seize, rather than place on the street,[6] contraband and articles which

---

6. The propriety of placing unattended on the street the goods removed from premises under the authority of a warrant of restitution is not presented to us in this case.

constitute a health hazard or are dangerous, whether discovered in plain view on the premises or found by a search. We do not make such determinations because it is abundantly clear that the taking of the credit cards by the Deputy Sheriff was an unreasonable seizure in the contemplation of the Fourth Amendment. They were not contraband. They were not dangerous or a hazard to health in the usual meaning of those terms. And the seizure of them was not removed from the constitutional proscription as being the taking of abandoned goods. It is patent that the actions of Boone in not paying the rent, or in not redeeming the leased premises prior to eviction, or in not being present at the time of eviction, were not sufficient to meet the test of abandonment with respect to the credit cards. Boone did not relinquish his right to the goods or to a reasonable expectation of privacy therein. His conduct did no more than give up a right to have the goods remain in the apartment. *Compare Buettner,* 233 Md. at 239-240 and the cases cited on the point in *Venner* and in *Everhart.* We hold that the seizure of the cards may not be justified under the doctrine of abandonment. *See Duncan and Smith v. State,* 281 Md. 247, 261-263, 378 A. 2d 1108 (1977).

## III

The State claims that even if the credit cards be deemed not to have been abandoned, there was no Fourth Amendment intrusion because the actions of the Deputy Sheriff amounted to no more than the taking of an inventory. It urges us to adopt the view that the taking of an inventory by enforcement authorities under a community caretaking function is not a search to be tested under Fourth Amendment strictures.

We reviewed the law regarding the Fourth Amendment and police community caretaking functions in *Duncan and Smith v. State, supra.* We accepted for the purpose of decision, but expressly did not decide, that the taking of an inventory by the police under their community caretaking function is a "search." *Duncan,* 281 Md. at 253, n. 1. Police caretaking functions are ordinarily with respect to automobiles; "[t]he search of an automobile is one of the class of carefully defined

cases which constitutes at least a partial exception to the general rule that a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Duncan* at 254, citing *Cady v. Dombrowski,* 413 U. S. 433, 439, 93 S. Ct. 2523 (1973). Although the opinion of the Court in *South Dakota v. Opperman,* 428 U. S. 364, 370-375, 96 S. Ct. 3092 (1976) found that the state courts "overwhelmingly" and a majority of the Federal Courts of Appeals have sustained inventory procedures as reasonable police intrusions, it is the legal impoundment of an automobile which permits the inventory search of the vehicle. *Duncan* at 256. A routine practice of securing and inventorying the automobile's contents developed in response to three distinct needs: (i) protection of the police from danger; (ii) protection of the police against claims and disputes over lost or stolen property; and (iii) protection of the owner's property while it remains in police custody. *Duncan* at 256-257, citing *Opperman,* 428 U. S. at 369. Even if the community caretaking functions were to be expanded to apply to the contents of dwelling units, despite the constitutional difference between houses and cars, *Chambers v. Maroney,* 399 U. S. 42, 52, 90 S. Ct. 1975 (1970), *see Duncan* at 254-255, it would not be applicable to justify an inventory search in the circumstances here. The statutory authority given the police went to the removal of the goods on the premises to be repossessed, not to the impounding of them. The three needs leading to the practice of securing and inventorying the contents of automobiles were simply not present here. There was no need to protect the Deputy Sheriff from danger, particularly since there was no one on the premises. There was no need articulated on the record itself to protect him or others involved in the removal of the goods against claims and disputes over lost or stolen property, and no need to protect the goods while in custody because the goods were not to be taken into custody but placed unattended on the public street. The short of it is that the Deputy Sheriff was clearly not conducting an inventory search under a community caretaking function. Since there was no inventory search, we again do not reach the question

whether an inventory search is within the ambit of the Fourth
Amendment.

## IV

The State further suggests that assuming *arguendo* that
Boone "retained a reasonable expectation of privacy in the
credit cards and checkbook, that the inventory thereof
constituted a Fourth Amendment intrusion, and that an
inventory is not another exception to the warrant
requirement, the intrusion was valid under the plain view
doctrine because the credit cards and checkbook were
immediately incriminating evidence." This notion, as the
Court of Special Appeals readily perceived, is laid to rest by
our discussion of the "plain view doctrine" in *State v. Wilson,*
279 Md. 189, 367 A. 2d 1223 (1977). Noting that the "plain
view" exception was enunciated in the plurality opinion in
*Coolidge v. New Hampshire,* 403 U. S. 443, 464-473, 91 S. Ct.
2022 (1971), we said:

> "This doctrine serves to supplement a previously
> justified intrusion, such as a search warrant for
> other property, and permits a warrantless seizure.
> *Id.* at 466. The exception, on the other hand, may not
> be used to expand a justified, but limited, intrusion
> into a general exploratory search of a person's
> belongings until something incriminating at last
> emerges. *Id.* at 466-67. To confine the exception
> within these boundaries, the Court prohibited the
> use of any evidence seized outside the warrant
> unless (1) the police have a prior justification for the
> intrusion; (2) they find the evidence in plain view; (3)
> they find it inadvertently; and (4) it is 'immediately
> apparent to the police that they have evidence before
> them,' *id.* at 466-71." *Wilson,* 279 Md. at 194-195.

Here, as in *Wilson,* we need look no further than the fourth
requirement. We observed in *Wilson* that "[t]his element, in
essence, amounts to a requirement that police have probable
cause to believe the evidence is incriminating before they

seize it. . . . Stated another way, to be subject to seizure, the object must be one for which the police could have obtained a warrant because they had probable cause." 279 Md. at 195. We set out the standard, applicable also to articles in plain view, used to determine whether probable cause existed to seize evidence as stated in *Warden v. Hayden,* 387 U. S. 294, 307, 87 S. Ct. 1642 (1967) (emphasis added):

> " '. . . There must, of course, be a nexus — automatically provided in the case of fruits, instrumentalities or contraband—*between the item to be seized and criminal behavior.* Thus in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.' " 279 Md. at 196.

We concluded:

> "Under the *Hayden* formulation, so long as police have probable cause to believe that what they see is contraband, or the fruit or instrumentality of some unspecified criminal activity, they may seize the object." *Id.*

Whether we regard the credit cards as the "fruit of crime" or "mere evidence," the record fails to show that the Deputy Sheriff had probable cause to seize them. We are in full accord with the findings of the Court of Special Appeals:

> "Mach clearly did not have probable cause to believe the credit cards were incriminating before he seized them. In fact, he testified that he had no knowledge that the cards were stolen. The presence of credit cards bearing several different names creates 'no more than a mere suspicion that any of the [credit cards] were stolen.' Like *Wilson,* the incriminating nature of the evidence became apparent only after the seizure." *Boone v. State,* 39 Md. App. at 33. *See Wilson,* 279 Md. at 197-198.

We hold that the seizure of the credit cards was not justified under the plain view doctrine.

12

## V

We have found no substance in the reasons advanced by the State in support of its claim that the seizure of the credit cards was not constitutionally proscribed. On the contrary, we believe it clear that the seizure was unreasonable within the contemplation of the Fourth Amendment and thus prohibited by it. It follows that our ultimate holding is that the trial court erred in denying Boone's motion to suppress the challenged evidence. This error, of course, was prejudicial. *See Dorsey v. State,* 276 Md. 638, 646-659, 350 A. 2d 665 (1976). We are, therefore, in accord with the reversal by the Court of Special Appeals of the judgments entered in the trial court.

The Court of Special Appeals precluded a retrial, citing *Gray v. State,* 254 Md. 385, 255 A. 2d 5 (1969), *cert. denied,* 397 U. S. 944 (1970). In *Gray* we concluded "that the practice of remanding for a new trial after reversal for insufficiency of the evidence rather than remanding for entry of a judgment of acquittal, is permissible." *Id.* at 393. We spelled out certain actions to be taken by the reviewing court depending upon the state of the record before it. One was that if the record indicates that no additional probative evidence can be adduced by the State, the entry of a judgment of acquittal should be directed. *Id.* at 397. We said:

> "[I]f the record before the Court of Special Appeals indicates that additional probative evidence of guilt can be adduced by the State at another trial necessitated by the insufficiency of the evidence, a new trial should be awarded after a reversal if the interests of justice appear to require it. If the record indicates that no additional probative evidence can be so adduced, the entry of a judgment of acquittal should be directed. If the Court of Special Appeals cannot determine from the record whether or not additional probative evidence can be produced on a retrial, and the interests of justice appear to require it, the Court should vacate the judgment and remand the case with directions to the trial court (a) to hold

a new trial if the State within a specified time can satisfy the court that it can produce additional probative evidence, or (b) to enter a judgment of acquittal if the State cannot preliminarily so satisfy the court." *Id.* at 397.

*Gray* was decided in the frame of reference of "another trial necessitated by the insufficiency of the evidence." We learned from *Burks v. United States,* 437 U. S. 1 , 98 S. Ct. 2141 (1978) and *Greene v. Massey,* 437 U. S. 19 , 98 S. Ct. 2151 (1978), that as the Supreme Court now construes the Double Jeopardy Clause of the Constitution of the United States, we were wrong. In *Mackall v. State,* 283 Md. 100, 114, 387 A. 2d 762 [, 770] (1978) we declared that *Gray* was no longer the law of this State.

In *Burks* the Supreme Court was squarely presented with the question whether a defendant may be tried a second time when a reviewing court has determined that in a prior trial the evidence was insufficient to sustain the verdict of the jury. 437 U. S. at 5 [, 98 S. Ct. at 2144]. It held that a defendant may not be retried in such circumstances. Recognizing that its holdings in this area were neither clear nor consistent, *id.* at 9 [, 98 S. Ct. at 2146], it stated that precedents to the contrary were no longer to be followed, *id.* at 12 [, 98 S. Ct. at 2147].[7] In *Greene* the Court held that the standard announced in *Burks* was applicable to state prosecutions "[s]ince the constitutional prohibition against double jeopardy is fully applicable to state criminal proceedings, *Benton v. Maryland,* [395 U. S. 784, 89 S. Ct. 2056 (1969)]. . . ." 437 U. S. at 24 [, 98 S. Ct. at 2154].

In reaching the determination in *Burks* of what it believed the Double Jeopardy Clause commands, the Court carefully distinguished between reversal for trial error and reversal

---

7. The Court observed that its prior cases generally did not distinguish between reversals due to trial error and those resulting from evidentiary insufficiency. It believed that the failure to make this distinction contributed substantially to the present state of conceptual confusion existing in this area of the law. Burks v. United States, 437 U.S. 1, 15, 98 S. Ct. 2141 [, 2149] (1978).

from evidentiary insufficiency. Allowing retrial to correct trial error is not constitutionally proscribed.[8]

> "[R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, *e.g.,* incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished." *Burks* at 15 [, 98 S. Ct. at 2149].

On the other hand, when a conviction has been overturned due to a failure of proof at trial, the prosecution has had a fair chance to prove its case. "Moreover," the Court observed, "such an appellate reversal means that the Government's case was so lacking that it should not have even been *submitted* to the jury. Since we necessarily afford absolute finality to a jury's *verdict* of acquittal — no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty." *Id.* at 16 [, 98 S. Ct. at 2150].[9]

---

8. In the Court's view the most reasonable justification for allowing retrial to correct trial error was advanced by United States v. Tateo, 377 U. S. 463, 466, 84 S. Ct. 1587 (1964):

> " 'It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.' " Burks v. United States, 437 U. S. 1, 15, 98 S. Ct. 2141 [, 2149] (1978).

9. In the Court's view, it made "no difference that a defendant has sought a new trial as one of his remedies, or even as the sole remedy. It cannot be meaningfully said that a person 'waives' his right to a judgment of acquittal by moving for a new trial." Burks v. United States, 437 U. S. 1, 17, 98 S. Ct. 2141 [, 2150] (1978).

The reversal by the Court of Special Appeals in the case *sub judice* was not predicated upon the insufficiency of the evidence adduced at the trial, but upon the improper denial of a motion to suppress evidence adduced. The evidence which actually, albeit erroneously, went before the trier of fact was ample to sustain the verdicts. The *legally competent* evidence, however, adduced at the trial was insufficient to prove guilt. That is, once the inadmissible evidence was discounted, there was insufficient evidence to permit the trier of fact to convict: "The seized credit cards were the crucial evidence, without which [Boone] could not have been convicted." *Boone*, 39 Md. App. at 33. The question is whether in such circumstances the Double Jeopardy Clause prohibits a retrial.[10] The Supreme Court recognized the question in *Greene* but left it open: "We express no opinion as to the double jeopardy implications of a retrial following such a holding [that once inadmissible evidence is discounted, there was insufficient evidence to permit the jury to convict]." *Greene*, 437 U. S. at 26 , n. 9 [, 98 S. Ct. at 2155].[11]

The point left unresolved by *Burks-Greene* is squarely before us. We decide it with the hope that we reach the same conclusion as that which will ultimately be reached by the Supreme Court. We find no clear direction in *Burks* and *Greene*. The Court did say in *Burks* that "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding," and declared: "this is central to the objective of the prohibition against successive trials." 437 U. S. at 11 [, 98 S. Ct. at 2147]. The Court iterated the substance of that statement in discussing a reversal for trial error as distinguished from

10. The Court of Special Appeals did not have the constitutional question before it. It denied a retrial because it thought that "[t]here is no basis for a retrial." Boone v. State, 39 Md. App. 20, 33, 383 A. 2d 412 (1978). That is, it precluded a retrial because, pursuant to *Gray*, it apparently believed that the record before it indicated that no additional probative evidence could be adduced by the State.

11. Nor was the Supreme Court willing to express an opinion as to the double jeopardy implications of a retrial ordered by a state appellate court "in the interests of justice," even though the evidence was technically sufficient to support a verdict of guilty. Greene v. Massey, 437 U. S. 19, 26, n. 10, 98 S. Ct. 2151 [, 2155, n. 10] (1978).

evidentiary insufficiency. Noting the interest of both an accused and society in obtaining a fair readjudication of guilt free from trial error, the Court observed:

> "The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble." *Id.* at 16 [, 98 S. Ct. at 2149].

We think that these statements are to be fairly considered in the context of the State's attempting to prove its case through evidence which is not affected by a court ruling upon challenge. It is only then that the prosecution "has been given one fair opportunity to offer whatever proof it could assemble." It is in such circumstance that the State is foreclosed from another opportunity "to supply evidence which it failed to muster in the first proceeding," for it was satisfied, without being influenced by a ruling of the court, that the evidence it adduced was sufficient to prove the guilt of the accused beyond a reasonable doubt and was content to stand or fall on such evidence. When, however, the trial court commits error by excluding prosecution evidence, which if received, would have rebutted any claim of evidentiary insufficiency,[12] we cannot conceive that the rationale of *Burks* would apply to prohibit a retrial. In such event, the evidentiary insufficiency would be due to trial error on the part of the court rather than by failure attributable to the prosecution to prove its case. *See Burks,* 437 U. S. at 16 [, 98 S. Ct. at 2149]. By the same token if the trial court erroneously admits evidence, resulting in reversal, as in the case before us, the State should not be precluded from retrial even though when such evidence is discounted there is evidentiary insufficiency. The prosecution, we believe, in proving its case is entitled to rely upon the correctness of the rulings of the court and proceed accordingly. If the evidence offered by the State is received after challenge and is legally

---

12. The Court pointed out in *Burks* that there was no such claim in that case. Burks v. United States, 437 U. S. 1, 5, n. 4, 98 S. Ct. 2141 [, 2144, n. 4] (1978).

sufficient to establish the guilt of the accused, the State is not obligated to go further and adduce additional evidence that would be, for example, cumulative. Were it otherwise, the State, to be secure, would have to consider every ruling by the court on the evidence to be erroneous and marshall and offer every bit of relevant and competent evidence. The practical consequences of this would seriously affect the orderly administration of justice, if for no other reason, because of the time which would be required to prepare for trial and try the case. Furthermore, if retrial were precluded because discounting erroneously admitted evidence results in evidentiary insufficiency, there would be no opportunity to correct an error by the court as distinguished from the mistaken belief by the prosecution that it had proved its case. It is in this context, we think, that *Burks* gave as examples of trial error not invoking the Double Jeopardy Clause with regard to retrial, the "incorrect receipt or rejection of evidence," along with "incorrect instructions" and "prosecutorial misconduct." *Id.*

In short, we do not see *Burks* and *Greene* as requiring that an accused may not be retried upon a reversal predicated upon an incorrect ruling by the trial court as to the admission of evidence. This is so whether the discounting of the improperly received evidence results in evidentiary insufficiency or whether the exclusion of the improperly rejected evidence prevents evidentiary sufficiency. In the absence of a clear direction, we answer the question left open in *Greene* by holding, for the reasons indicated, that a retrial is not constitutionally proscribed when judgment is reversed on an appellate court's determination that evidence was erroneously admitted, even though without that evidence the trier of fact could not convict.

It follows that Boone may be retried. We are not privy to all the evidence available to the State, and what evidence it could possibly adduce is not reflected in the record before us. It may be that the charges can be proved without the admission of the illegally seized credit cards. In our opinion, the State, in the circumstances, is not constitutionally precluded from the opportunity to do so.

The State requests that should we affirm the judgment of the Court of Special Appeals, we remand for a new trial. We shall do so. We affirm the judgment of the Court of Special Appeals with the modification that the case be remanded for a new trial.

> *Judgment of the Court of Special Appeals modified in accordance with this opinion and as modified it is affirmed; costs to be paid by Prince George's County.*

*Cole, J., dissenting in part and concurring in part:*

The appellee, Marcus Angelo Boone, was convicted on two counts of receiving stolen goods. The only evidence adduced at trial to support these convictions was illegally seized at the appellee's apartment. The majority holds that since the introduction of the tainted evidence constituted trial error, the case must be remanded for retrial even though the evidence remaining after deduction of the inadmissible material is legally insufficient. I disagree.

In *Burks v. United States,* 437 U. S. 1 , 98 S. Ct. 2141 (1978), the Supreme Court held that where an appellate court rules that evidence adduced in a criminal proceeding is insufficient to convict, the Double Jeopardy Clause mandates the direction of a judgment of acquittal. Where there has been a trial error, however, the Court held that the proper remedy is remand and retrial. In holding that under the circumstances of this case the State is entitled to reprosecute the appellee, the majority has obfuscated the vital distinction between evidentiary insufficiency and trial error, and totally undermined the teachings of *Burks, supra.*

In distinguishing trial error[1] from evidentiary insufficiency, the Supreme Court in *Burks* stated:

> In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute

___

1. The Supreme Court in Burks, at n. 8, lists examples of trial error: improper instruction, absence of the accused during a portion of the trial,

a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect . . . . *Id.*

Applying this distinction to the facts of the instant case, it is readily apparent that something more than mere trial error is involved. Here, reversal of the trial court's judgment necessarily constitutes "a decision to the effect that the government has failed to prove its case" because exclusion of the tainted material leaves the record virtually devoid of incriminating evidence. The proper remedy is therefore acquittal.

This result is fully consistent with any reasonable interpretation of the *Burks* principle. If this case involved *only* the erroneous admission of evidence, then under the *Burks* principle the appropriate remedy would be retrial. As the *Burks* Court noted, when trial error occurs, "the accused has a strong interest in obtaining a fair readjudication of his guilt free from error . . . ." *Id.* Thus, even if the remaining evidence were sufficient to convict, a remand of the case would be required. However, where, as here, the "trial error" results in an insufficiency of evidence, the *Burks* principle mandates an appellate reversal. Again, as the Court in *Burks* pointed out, where there has been a failure of proof at trial "the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble." *Id.*

The majority here, however, contends that the State was somehow denied its "one fair opportunity" to offer proof. The

---

improper hearsay testimony received, insufficient indictment, improper sentence. In the text of Burks, at 2149, the Court further describes trial error as "incorrect receipt or rejection of evidence, incorrect instruction or prosecutorial conduct." I submit that the Court is describing in all such instances the kind of error which does not have the effect of creating an evidentiary insufficiency on appellate review. If not, why did the Supreme Court expressly reserve the question in Greene v. Massey, 437 U. S. 19, 98 S. Ct. 2151, 2155 n. 9 (1978)?

majority argues essentially that, "The prosecution, ... in proving its case is entitled to rely upon the correctness of the rulings of the court and proceed accordingly." Such a proposition is preposterous on its face. If in the instant case the State had not introduced the tainted material and the appellee had been convicted on the basis of the other evidence, under *Burks, supra,* the direction of a judgment of acquittal would have been mandatory. Why should a different result obtain where the tainted material is introduced? Clearly, the effect of the majority's decision is to encourage the prosecution to introduce tainted material in all criminal prosecutions where the evidence would otherwise be weak. If the trial court accepts the material into evidence, the State is automatically assured of a second opportunity to prosecute the accused in the event of an appeal. Conceivably, the State could exploit this device to secure several opportunities to prosecute the accused and present additional evidence at each successive proceeding. Such a scheme plainly subverts the purposes underlying the exclusionary rule. Furthermore, under the majority's approach, if the trial court improperly admitted a coerced confession and the evidence were otherwise insufficient, the State on appeal would be granted the opportunity to reprosecute the case. This would permit the State to benefit from its own misconduct.

Moreover, the State's opportunity to offer proof was far more generous here than in the ordinary case where evidentiary insufficiency compels reversal. If this case had involved merely a failure of proof, the State would have had no opportunity to correct its failure because the motion for judgment of acquittal would have been made only after the close of the State's case. Rule 755. Here, however, the appellee's motion to exclude the tainted material afforded the State adequate notice of a potential flaw in its case while there was still time to produce additional evidence. In this instance, the State chose not to avail itself of this opportunity.

In an attempt to defend its position, the majority argues that a contrary result would require the State to marshall every piece of relevant and competent evidence and consider every evidentiary ruling by the trial court to be erroneous.

It is submitted, however, that the interests of justice are best served by just such a requirement. It is the ultimate burden of the State to offer evidence sufficient to convict. If the State chooses to rely upon the rulings of the trial court it must assume the risk that such rulings will be reversed on appeal.

Finally, for all of its concern over the orderly and expeditious administration of justice, the majority has neglected to even mention the issue of fairness to the accused. The Double Jeopardy Clause embodies a fundamental principle of criminal justice. It is inconceivable that the framers of the Constitution would have intended that its proscription should be suspended for the sole purpose of permitting the introduction of additional evidence by the prosecution. The appellee here has been tried once and has successfully met the challenge demanded of him by law. The State, on the other hand, has failed to meet its burden of proof. It would be fundamentally unfair to permit the State the opportunity at this point to correct its own failure at the appellee's expense.

For the above stated reasons I must respectfully dissent.