**UNITED STATES of America**

v.

**Kenneth SANFORD.**

**Crim. No. 80–173.**

United States District Court,
District of Columbia.

June 13, 1980.

Elliot R. Warren, Washington, D. C., for U. S.

Bernard W. Kemp, Washington, D. C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge.

While executing a valid writ of restitution issued by the Landlord & Tenant Branch of the Superior Court of the District of Columbia, a Deputy United States Marshal turned over to the city police a sawed-off shotgun found in the apartment rented and occupied by the defendant Kenneth Sanford. A federal grand jury later indicted and charged the defendant with the possession of an unregistered firearm, 26 U.S.C. § 5861(d). Sanford's attorney filed a motion to suppress the seized weapon as well as certain statements made by the defendant to law enforcement officials during his arrest, because of failure to advise him of his *Miranda* rights and provide appropriate warnings, *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

At the suppression hearing, testimony was offered by the deputy marshal in charge of the detail who discovered the weapon while executing the writ, the police officer who received the gun from the marshal, and the defendant Sanford. Because the marshal, in executing the writ of restitution, conducted an impermissible search of the defendant's apartment, unwarranted by the circumstances and in violation of the defendant's Fourth Amendment rights, the motion to suppress the weapon is granted.

The undisputed facts are briefly summarized. On March 14, 1980 a writ of restitution was issued out of the Superior Court because of the lessee's failure to pay rent for an apartment in the premises 1629 Columbia Road, N. W. The apartment was in fact leased to a Harold Sanford. However, the defendant Kenneth Sanford admitted that he was in fact the lessee, had occupied the apartment and paid the rent for the last several years.

In executing the writ the marshal made a forcible entry after determining that no one was present and that the resident agent did not have a pass key. Upon gaining entry he first made a "cursory inspection" to de-

termine the presence of any occupants or persons. None was found. The inspection continued and included a search for dangerous weapons, contraband items and articles of value—such as cash or jewelry. In conducting the "cursory inspection" he opened several drawers to a dresser found in the bedroom. Handguns and a holster were found in two separate drawers in plain view on top of articles of clothing. In a bed stand drawer a small shallow cardboard box was observed. It was opened and the marshal picked through its contents and found telephone numbers and names written on small pieces of paper, several pay stub slips from a local hospital, canceled checks and miscellaneous pieces of paper and bills. Sanford's name was imprinted on the checks.

On the floor next to the dresser and leaning against the wall the marshal observed a red leather briefcase. Upon picking it up he discovered that it was closed by a zipper extending across its top. Protruding and extending several inches from the top of the case was a baton. The zipper extended up to and against the baton. He described the bag as heavy in weight and other than the protruding baton he could not see or determine the contents. He testified that he "suspected" it contained a weapon. The marshal then opened the zipper and observed a brown paper bag. Upon closer examining and opening the paper he found a sawed-off shotgun. Also found were bullets and several syringes. Elsewhere, the marshal also found a jar of bullets, a page beeper and in the kitchen area, several small plastic bags.

The shotgun, leather bag, baton, syringes, two handguns, box of papers, bullets, beeper and plastic bags were then placed aside for the police. The marshal then called his immediate supervisor and the Metropolitan Police Department. The guns, briefcase, baton, contents of the box, beeper and other articles were turned over to the police when they arrived. The eviction continued and the other contents of the apartment were placed on the public street.

\* Government Exhibit No. 2.

The pay stub slips led the police to Kenneth Sanford who was employed at the Washington Hospital Center. A police car was dispatched to the Hospital. The defendant was told of the eviction and that his property was being removed from the premises. He was brought back in the police vehicle and upon arrival at the Columbia Road building was asked if he could identify any of the furniture which had then been placed on the public street. When he responded affirmatively he was arrested and charged with possessing an unregistered firearm.

The marshal justified his entry, the "cursory inspection" and seizure of the shotgun and other articles on basis of a United States Marshal Directive, USMD No. 75–10, February 12, 1975.\* The Directive established guidelines to be followed by the United States Marshal when executing a writ of restitution. It governed (1) the method of entry upon a premises and (2) routine procedures to be followed upon entry. The relevant section of the Directive reads:

II. Method of Execution Subsequent to Entry

\*   \*   \*   \*   \*   \*

1. . . . where the defendant or other third parties are on the site, [the marshal's] first order of business should be to make a cursory inspection of the area to insure that there are no dangerous weapons or other contraband items readily available to the occupants that might be used against him. Particular attention should be paid to the kitchen (knives), the closets (rifles) and under the mattress in the bedrooms (handguns). After he has ascertained to his own satisfaction that the area is clear of such items he should proceed with the physical removal of the defendant's property. Should narcotics be located, call the MPD FORTHWITH. . . .

2. . . . where the defendant is not on site [the marshal's] first order of business should be to make a cursory inspection of the premises for all items

listed in paragraph 1 above, as well as any VALUABLE ITEMS, such as cash or jewelry, that may be within the premises. . . . Items of value and weapons found . . . are to be secured and turned over to the . . . Metropolitan Police Department. . . .

The marshal in charge of the detail was a 10-year veteran and otherwise experienced in his assignment. Before March 14, he had served on two or three hundred evictions. On cross-examination, however, he revealed a misplaced conception of his authority under the circumstances. In response to questions put by Sanford's attorney he stated that the writ was the equivalent of a search warrant issued by a judicial officer who could authorize a search of the premises. Indeed, on basis of the 1975 Directive he regarded the writ as a search warrant. His testimony reflected the extent and the wide range of authority which he felt that he possessed.

■ When he found the two handguns, his attention was then directed to the cardboard box. The search and subsequent seizure of its contents were clearly not warranted by the Directive. No jewelry, money, intoxicants or contraband were found in the box. It only contained personal items including miscellaneous papers, canceled checks and old pay slips. Nonetheless, the marshal sifted through, read, and set aside the items. There was no justification whatsoever under the Directive for the marshal to rummage through and segregate the contents of the box and turn them over to the police. Likewise, the Directive afforded no justification for seizure of the other items.

At the time the marshal saw the briefcase it was closed. It was not in an unusual place or position on the floor. Under the procedures as explained by him and under the Directive, the closed briefcase would not have been opened ordinarily. Had it been locked, rather than simply closed as it was by a zipper, it would have remained in that condition and turned over to the custody of the police.

The marshal's admissions on cross-examination together with his testimony as to examination and seizure of the box and its paper contents, the seizure of the beeper, the baton, the plastic bags in the kitchen and the search of the briefcase, belie any notion that he was engaged in a "cursory inspection." His testimony together with his actual conduct while in the apartment reflect a sweeping search nearly unlimited in scope. At best the writ of restitution and the Directive supported no more than a limited intrusion. Such intrusion, however, could not exceed what was necessary to effect the purpose of the Directive, namely, to arrange protection for valuables and segregate guns and contraband.

■ Sanford was entitled to an expectation that his personal effects and property would not be subject to a full-scale exploratory search even though they would be displaced and removed to the public street. The writ did not warrant an unrestrained and broad invasion upon the defendant's interests and rights. A civil process may not be converted into a warrant for a general search. The testimony showed that the marshal's "cursory inspection" developed into a nonroutine investigation to uncover evidence of crime. He had a subjective belief that the Directive granted him wide authority to search and look through the defendant's personal effects and apartment. Sanford's eviction was not conducted in good faith but rather the writ served as a pretext and a subterfuge for a warrantless search violative of his Fourth Amendment rights. *Boone v. Maryland*, 39 Md.App. 20, 383 A.2d 412 (Ct.Spec.App.), *modified*, 284 Md. 1, 393 A.2d 1361 (Md.1978); *People v. Stadtmore*, 52 A.D.2d 853, 382 N.Y.S.2d 807 (App.Div.1976); *Chuze v. Florida*, 330 So.2d 166 (Fla.App.1976); *see United States v. Cooper*, 428 F.Supp. 652 (S.D.Ohio 1977). The government's reliance on *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) is misplaced and the facts are remarkably different.

■ As to the suppression of statements attributed to the defendant at or about the time of his arrest, the government, because of an administrative mixup and a communi-

cation problem with the Metropolitan Police Department was unable to produce the principal police witnesses to offer first-hand testimony as to the circumstances under which Sanford was advised of his rights. The testimony of Officer Philip G. Villanueva was hearsay twice removed, unreliable, and shed little light on what happened. The defendant denied that at any time he was advised of his rights. Under the circumstances and in view of the limited testimony presented the Court grants the defendant's motion to suppress statements attributed to him at the time of his arrest.

The motion of the defendant to suppress the sawed-off shotgun and statement is granted.