CHARLES ELLERBA alias Alphonso Davis
*v.* STATE OF MARYLAND

[No. 259, September Term, 1978.]

*Decided March 13, 1979.*

The cause was argued before MOORE, MELVIN and LISS, JJ.

*David W. Skeen, Assigned Public Defender,* for appellant.

*F. Ford Loker, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Jonathan Shoup, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

Appellant, Charles Ellerba, alias Alphonso Davis, was convicted by a jury in the Criminal Court of Baltimore (Kaplan, J.) on December 8, 1977 of two charges of arson. He was thereafter sentenced to two consecutive 20-year terms. On appeal, he argues six assignments of error by the trial court: (1) appellant did not freely and voluntarily waive his right to counsel on May 31, 1977 and, therefore, it was error to admit statements made by him at a custodial interrogation on that date; (2) appellant did not breach the June 9, 1977 agreement between himself and the State in which the State promised not to use appellant's May 31, 1977 statements in return for appellant's cooperation and, consequently, it was error to admit his May 31 statements; (3) the court should not

have admitted evidence, from any source, of other arsons allegedly committed by appellant; (4) appellant's motion for a separate trial on each of the two indictments should have been granted; (5) the evidence was insufficient to convict appellant of the arson of 12 South Calhoun Street; and (6) the evidence was insufficient to convict appellant of the arson of 2470 Shirley Avenue.

# I

On May 24, 1977, appellant was arrested and charged with the arsons of 12 South Calhoun Street, 2470 Shirley Avenue, and 516 North Pulaski Street. The latter charge was subsequently *nol prossed.* Bail was set at $250,000. Assistant State's Attorney Jonathan Shoup, Detective John Dillon, and Sergeant Paul Lioi first met with the appellant on May 25. After the *Miranda* rights were read to the appellant, he indicated he wanted a lawyer. Following appellant's request and before appellant was returned to his cell, the men asked appellant several routine questions, not concerning the fires. No incriminating statements were elicited.

James Gitomer was retained tentatively as defense counsel on May 26 by appellant's wife and mother. A possible conflict of interest, later determined to be nonexistent, necessitated the tentative nature of the appointment. On May 27 appellant and Gitomer met. Assistant State's Attorney Shoup, who was handling the case, was aware of this meeting but did not record it nor notify others in the State's Attorney's office before he departed on May 27 for a two-week tour of duty in the Army National Guard.

Thereafter, on May 30, Detective Dillon was notified by Sheila Mack, appellant's girlfriend, that he wished to talk with them. A writ of habeas corpus was issued and appellant was brought to the State's Attorney's office on May 31, where Detective Dillon, Sergeant Lioi, and Assistant State's Attorneys Howard Gersh and Michael S. Glushakow were present. It was later testified that all of these individuals were unaware that appellant was represented by counsel.

Before any questioning commenced, Gersh, as a

precaution, thoroughly explored with appellant his reasons for wanting to talk. Appellant replied that he was tired of being used by his "employers" and he no longer wanted to take the blame alone for the fires. Gersh, after he was satisfied that appellant had voluntarily and intelligently reached his decision, repeated to Ellerba his *Miranda* rights, but appellant indicated, in writing, that he did not want a lawyer present.[1]

Following the waiver of counsel, appellant proceeded to discuss his involvement in six fires. None of the fires appellant discussed were involved in the indictments. Appellant described, in elaborate detail, schemes to defraud insurance companies whereby he was paid by one William Goldberg and one Al Rachelson to set fires to various properties they owned in Baltimore City. According to Gersh, appellant, a home improvement specialist by trade, described himself as a "furnace man." He drew for Gersh a detailed diagram of his method of setting fires. Appellant said he would lower the thermostat, turn off the electrical current, splice the wire running from the thermostat to the furnace, and then run more wires off the main wire. These wires were exposed. Appellant would then place a flammable liquid near the wires surrounded by some type of flammable substance. Depending on the outside temperature, appellant would set the thermostat at an appropriate degree so that it would trigger the furnace after he had left. When this occurred, the electrical current passed through the exposed wires which would ignite the flammable substance, causing the fire. Appellant admitted starting 6 or 7 fires using this method, including properties at North Pulaski Street, Boyd Street, Groveland Avenue, and 1825 and 1827 West Baltimore Street.

Although appellant's statements made during this meeting were later reduced to written form by his interrogators, he did not sign them. During the questioning session, appellant

---

1. Dillon testified that appellant, in reaching this decision, appeared normal, unaffected by drugs or alcohol, and answered the questions fairly and intelligently. However, at the suppression hearing, appellant, in somewhat contradictory fashion, claimed he repeatedly requested an attorney, yet admitted signing the waiver form in addition to initialing the portion stating he did not want an attorney present.

agreed that he would testify to the same information before the grand jury the following day. However, before the questioning was concluded, defense attorney Gitomer, who had discovered appellant was being questioned without his knowledge, burst into the State's Attorney's office in an outrage. Curiously, according to the testimony of Gersh, appellant said that he did not know Gitomer nor did Gitomer represent him. Because of this confusion, Gersh suggested that Gitomer and appellant go into the next room to discuss the matter. Later, the two men emerged from their discussion with appellant apparently accepting Gitomer as his counsel and, at the latter's request, an agreement was made to cancel appellant's grand jury appearance for the next day.

The appellant and the State subsequently entered into a written agreement on June 9, 1977 whereby the appellant agreed to cooperate with the State and the grand jury in the arson investigations then being conducted by the office of the State's Attorney. In return, the State promised appellant: there would be no further indictments against him; the May 31 statement would not be used against him; and there would be a recommendation for his release on $5,000 bail and notification to the sentencing judge of appellant's cooperation. It was a condition of the agreement that appellant give "truthful testimony" and provide "reasonable cooperation" throughout the investigation. If appellant failed to honor his commitments, the agreement would become null and void and the State would then be free, among other things, to use the statement and to charge him "in any matters."

Pursuant to this agreement, appellant testified before a special session of the grand jury, giving the same information he related to his interrogators on May 31. His testimony led to the indictments of William Goldberg and Al Rachelson. Subsequent to these indictments, information was uncovered which placed the truthfulness of appellant's testimony at issue and resulted in the dismissal of the Goldberg and Rachelson indictments. Between July and October, the State repeatedly attempted to locate appellant to question him further but efforts to locate him were fruitless. According to

the State, appellant had thus breached the agreement, thereby releasing it from the promises made to appellant and freeing it to use his statements in his trial scheduled for October 13, 1977.

On the initial day of trial, the court first took testimony on appellant's motion to suppress his May 31 statements. The witnesses were Detective Dillon, Mr. Gersh, Mr. Shoup, and the appellant. The court ruled that the appellant freely and voluntarily waived his right to counsel. Furthermore, it was held, appellant had breached the June 9 agreement, therefore permitting the State to use his May 31 statements. Appellant's motion for a severance, which accompanied the motion to suppress, was also denied, the court stating that severance was "not legally required."

At trial, the State first presented testimony concerning the incendiary nature of the fire at Shirley Avenue which occurred on January 22, 1977. When the blaze occurred, the house—owned by appellant and his wife—was being remodeled. According to Battalion Chief Fred R. Schwartz, Jr., who had ordered a "complete second alarm assignment" after he had arrived on the scene, the fire, apparently originating in the basement, moved through the dumbwaiter shaft to other levels of the dwelling, the damage being heaviest in the stairway area. A separate fire had started in the upstairs bedroom. In the basement, there were few burn marks on the furnace. A five-gallon can with the residue of what appeared to be flammable paste, resembling tile paste, was found there.

Qualified as an expert in the field of fire investigation, Captain Robert Hatoff of the Fire Investigation Bureau of the Baltimore City Fire Department, testified that "the fire was incendiary in origin." Hatoff said that the debris and the unusual burn patterns—indicative of burning from flammable liquid—caused him to conclude that arson had been perpetrated. Hatoff also testified that soon after the fire apparatus had arrived, appellant appeared at the scene and identified himself as owner. In response to his questioning, Ellerba said he had been "in and out" of the Shirley Avenue premises during the day. Hatoff asked him to remain for

further questioning. Appellant, however, disappeared. Following his testimony and that of several other witnesses, Captain Hatoff was permitted, over objection, to be present in the courtroom during the testimony of Assistant State's Attorney Gersh. Captain Hatoff thereafter testified, using for illustration pictures taken at Shirley Avenue after the fire, that, in his opinion, the fire had been started by the "furnace method," in the same way described by appellant in his May 31 statement.

As to the Calhoun Street fire, which occurred on November 27, 1975, Thanksgiving Day, Captain John C. Richter of the Fire Investigation Bureau was the State's main witness. He testified that the fire started and was contained in the basement of the temporarily vacant three-story dwelling. The colors of the burn marks were darkest on the floor, which indicated to Richter that the fire started there before it proceeded up the wall. The investigation was conducted several days after the fire and all of the debris had been moved outside. The investigators, therefore, were unable to determine whether a flammable liquid had been used. Investigators also were prevented from obtaining fingerprints because the wood was either wet or charred. No pictures were taken.

Through the testimony of the claims manager of the Hartford Mutual Insurance Company, the State introduced a notarized proof of loss statement executed by appellant and a draft for $1,247.11 covering the property loss to South Calhoun Street. The draft was payable to appellant and two other payees, Central Public Adjusters, the loss adjusters, and Grant Cylus, also known as William Goldberg. The witness did not know who ultimately received the draft proceeds.

Olivia Anderson Jones, the appellant's former girlfriend, who was living with him on the day of the South Calhoun Street fire, testified that on the morning of the fire, appellant left the house early, around 6:00 a.m., and returned between 8:30-9:00 a.m. Upon his return, she testified that he said he had "dropped a match"; later he also said "he put oil in the furnace [and] he let the oil out." The fire at the South Calhoun Street address occurred at 8:56 a.m. Almost all of the

furniture that Jones and appellant owned was in the house when the fire occurred.

At the time of the South Calhoun Street fire, appellant was working for Goldberg doing home improvement work. Jones testified that appellant had told her he was in another business with Goldberg—the business of setting fires for a fee and collecting the insurance proceeds. According to Jones, appellant said he had set fires at Fayette Street and Pulaski or Payson Street by "letting the oil out of the furnace." The witness, in concluding her testimony, said she received $4,000 from an insurance company for her property, consisting mostly of furniture which was destroyed in the subsequent Shirley Street fire.

Zelda Ellerba, appellant's wife, was also a State's witness. Mrs. Ellerba, after reading a list of fifteen properties she and appellant had owned jointly,[2] said she was aware that there had been fires at four of these properties—South Calhoun Street, Groveland Avenue, 22nd Street, and Fayette Street. Moreover, she knew appellant had received insurance proceeds for two of these fires. She was ignorant, however, of the South Calhoun Street fire until, after receiving a summons to clear the debris, she inspected the property. The witness had no knowledge of the insurance proceeds or the proof of loss statement for 12 South Calhoun Street, On cross-examination, Mrs. Ellerba testified that the mortgage payments for the properties purchased from Goldberg were paid directly to Goldberg and out of these payments, he paid the insurance and ground rent. Goldberg was also an insurance agent.

The State's principal trial witnesses to appellant's detailed statements of May 31 were Assistant State's Attorney Gersh and Sergeant Lioi of the Police Arson Squad. Gersh discussed appellant's recitation of his involvement in various fires—1825 West Baltimore Street, 516 North Pulaski, and

2. The witness testified that she and appellant owned properties at 531 South Smallwood, 12 South Calhoun, 1916 Park Avenue, 117 Carey Street, 335 Stricker Street, 2543 Ashton Street, 1919 Edmondson Avenue, 1808 Edmondson, 531 Pulaski Street, 516 Pulaski Street, 4004 Groveland Avenue, 419 Roundview, 2303 Fayette Street, 409 22nd Street, and 1113 North Bond Street.

1827 West Baltimore Street—and the furnace method he used to start them. According to appellant, he was paid fees of $400 or $100 per fire by either Rachelson or Goldberg. The witness, after examining the land records, found a complex chain of ownership transfers between the appellant and Goldberg. Gersh testified that although both Ellerba (Davis) and Goldberg (Cylus) had changed their names, they used their old and new names on legal documents. The parties were frequently transferring the properties, struck by fires, back and forth. In some instances, although the property was in the name of one party, the insurance proceeds would be paid to the other.

Sergeant Lioi testified that he was present when appellant made his May 31 statement. Although appellant said he could not remember all of the fires in which he played an active role, he did discuss 6 or 7 fires with Lioi. Lioi took almost verbatim notes while appellant confessed to the arsons—all started by the furnace method—of 1825 and 1827 West Baltimore Street, 516 North Pulaski, 2518 Boyd Street, and 4004 Groveland Avenue. According to appellant, and later confirmed by the records, these properties were owned by either Goldberg or Rachelson.

The appellant's case consisted of four lay witnesses, including himself. The almost exclusive purpose of these witnesses was to discredit Olivia Jones through testimony that she possessed a jealous and revengeful nature. Martha Means, another girlfriend of the appellant, was also an alibi witness, testifying that she was with him at her mother's residence in New York on the day of the South Calhoun Street fire. However, she could not remember the New York address because her mother was very transient. On one occasion, Means said, Jones had threatened to shoot her because she was jealous of her relationship with appellant. Means who testified that she "was going with appellant," was unable, however, on cross-examination, to remember where he lived. Robert Reed, a friend of appellant, and Mary Tate, the appellant's mother, also testified to incidents allegedly indicative of Jones' jealousy and motivation to fabricate.

When appellant took the stand, he denied any involvement

in the Shirley Avenue or South Calhoun Street fires. He also testified that on November 27, the date of the South Calhoun Street fire, he did not own that property because it had been sold at a tax sale on the same day. On cross-examination, however, it was shown that on the sworn insurance proof of loss statement appellant claimed ownership of the property. With respect to his grand jury appearance, he testified that all his testimony was false. The May 31 statement, he said, was also false. He stated that he told his interrogators what he thought they wanted to hear in order to have his bail reduced from $250,000 so he could be released from jail. (The bail was, in fact, reduced to $5,000 and he was released.)

After appellant presented his case, defense counsel renewed his motion for judgment of acquittal. The court denied the motion. The jury returned guilty verdicts under both indictments.

## II

We shall consider first appellant's contention that the trial court erred in holding that his statement made on May 31, 1977 was freely and voluntarily given, after he had intelligently waived his right to counsel. This issue is based primarily upon sixth amendment principles but it appears from appellant's brief that questions involving appellant's fifth amendment privilege against self-incrimination are tangentially involved.

With respect to the question of appellant's waiver of his right to counsel prior to making the statements, the record herein discloses that: (a) when appellant was first interviewed on May 26, 1977, he requested counsel and at that time further interrogation ceased; (b) when counsel was engaged for appellant by his mother and sister the following day, there was some question of a possible conflict of interest that would preclude the retainer; (c) when counsel was engaged, this representation became known only to the Assistant State's Attorney Shoup who thereafter left on a tour of military duty for two weeks; (d) Mr. Shoup's knowledge was not communicated to Mr. Gersh who handled the case in his

absence and (e) no formal appearance of counsel was made of record. Also critically important is the fact that the appellant and not the State sought the May 31 interview with the State's Attorney's office, and at that time—after again being administered his *Miranda* rights—he waived counsel in writing and made no disclosure to Mr. Gersh or the police officers that Mr. Gitomer had been retained. Indeed, when Mr. Gitomer appeared at the offices of the State's Attorney and loudly protested the interrogation of his client, appellant initially questioned whether Mr. Gitomer was his counsel.

Maryland has not adopted the minority view, the so-called *per se* rule, which mandates exclusion of all statements given by an accused after defense counsel has been engaged unless counsel has been advised of the State's intention to take a statement and has been given an opportunity to be present. *See generally Watson v. State,* 282 Md. 73, 78, 382 A. 2d 574 (1978); *State v. Blizzard,* 278 Md. 556, 567-74, 366 A. 2d 1026 (1976). Thus there is no basis for appellant's apparent contention that his May 31 statement was admitted improperly because defense counsel was not present. Indeed, we consider it manifest that his contention would be unsupported even under the minority view because his retainer of counsel was unknown to his interrogators and he himself withheld it.

The facts here are totally unlike those involved in *Brewer v. Williams,* 430 U.S. 387 (1977) upon which appellant relies. There, the police officers knew that the appellant was represented by counsel and the latter had specifically requested that his client not be questioned. Furthermore, in *Brewer* the defendant himself advised the police that he did not want to respond without the presence of counsel. The officers, however, ignoring the defendant's request and without administering the *Miranda* warnings, proceeded by trickery to elicit incriminating information from the defendant, an individual peculiarly susceptible to psychological ploys.

In the present appeal, appellant's statements were not extracted by the State nor was there any surreptitious or questionable inducement. Rather, the facts in the instant case

are similar to those in *State v. Blizzard,* 278 Md. 556 (1976), where the request to make a statement originated with the accused and to those in *Watson v. State,* 282 Md. 73 (1978), where the defendant "took matters into his own hands" and elected to speak with the prosecutors in the absence of his counsel and against the latter's advice.

As to the issue of voluntariness—independent of the question of presence or absence of counsel—we find here no overreaching by the State which would support appellant's charge, made in brief, that the prosecution was guilty of a "fast and loose manipulation of the bail system." The interview of May 31 was held because appellant, not the prosecutors, requested it. True, the State was interested in obtaining his cooperation in a far-reaching investigation leading to the apprehension of those who had hired appellant to commit the various arsons involved. But appellant, hardly an uninterested party, was motivated by his desire to have his bail reduced from $250,000 to an affordable sum. We think the State has asserted correctly that there was a reasonable inference that appellant "set the price for his bartered testimony." Of course, the trial court was free to accept or reject appellant's version of the facts and obviously rejected appellant's testimony that his bail would be reduced to $5,000, if he waived his right to counsel.

Upon our independent review of the record in this case, we find ample support for the trial court's conclusion that appellant knew of his right to counsel, that he freely and intelligently waived this right prior to giving a statement, and that his statement was voluntary.

### III

The trial court also ruled that the use of appellant's May 31 statements was not precluded by his June 9 agreement with the State. Here, appellant's assignment of error involves the following portions of the agreement:

"(7) It is also understood and agreed that this agreement is based upon truthful testimony of Mr.

Ellerba and reasonable cooperation throughout the investigation.

(8) In the event he testifies untruthfully or fails to give his cooperation, this agreement shall be considered null and void and the State shall have the option of charging him in any matters and using any and all statements, evidence, and/or testimony against him."

One of the commitments contained in paragraph 7 was that appellant was to testify truthfully. Yet, by his own admission at trial, he lied to the prosecutors and to the grand jury. Appellant sought to justify these false statements by stating that he was merely telling the story he felt the State wanted to hear.

The second commitment was that appellant cooperate in the ongoing investigation. The record clearly discloses, however, that appellant made himself incommunicado from early June 1977 until the middle of October when his trial was scheduled. Telephone messages left at his last address and with relatives remained unanswered, police searches were unavailing, and when appellant finally appeared for trial on October 13, he was reported as saying unequivocally:

"The only thing I was supposed to do was talk to you so I could get out on bail and I want to go to trial today. I'm not going to do anything further; I'm not going to do anything more."

This statement alone is sufficient to support the ruling of the lower court that the agreement to cooperate, contained in paragraph 7, had been breached. It is patent that appellant treated his obligations to cooperate as discharged on the date he testified before the grand jury. This was entirely contrary to the understanding of the agreement to which he testified before the grand jury, namely, that he would return to the State's Attorney's office "at [their] reasonable request and continue to discuss [those] matters both in [their] office and before the Grand Jury, about further fires or about anything that anyone want[ed] clarified. . . ."

## IV

Appellant's third assignment of error is that the court below should not have admitted evidence, from any source, of other arsons allegedly committed by him. The State's position is that appellant waived appellate review of this question when he failed to object to its introduction. *See Rose v. State,* 240 Md. 65, 69-70, 212 A. 2d 742 (1965). It is fundamental that, irrespective of the disposition of an original objection, a subsequent failure to object to the same evidence introduced through the same or different witnesses waives the error on appeal. *S & S Building Corp. v. Fidelity Storage Corp.,* 270 Md. 184, 190-92, 310 A. 2d 778 (1973); *Sutton v. State,* 25 Md. App. 309, 316, 334 A. 2d 126 (1975).

Our examination of the record discloses that appellant, during the course of direct examination of appellant's wife, Zelda Ellerba, made a timely objection when she was asked if she knew of "any other fires at any of the other properties" she owned other than the properties at Shirley Avenue and Sourth Calhoun Street. At that juncture, there was a colloquy at the bench and appellant's counsel argued that evidence of other crimes neither went to motive nor showed a common scheme or plan. He further asserted that "all it goes to show is that he has a propensity to set fires and I suggest that is an improper use of any other mention of any other fires." To this argument, the State responded:

> "Your Honor, to lay the foundation for common scheme and design, which will make this admissible, I must show, first, he owned the property with his wife and, two, there were fires in the properties at different times when he did own them. Then if I bring out and show this common scheme and design, that these fires were set in the same way and relate them to the two properties in the indictments, I'm showing a continuing scheme, common scheme and design, m.o., modus operandi of the defendant which would be perfectly legal."

Thereafter, the objection was overruled, and Mrs. Ellerba proceeded to testify about the fires at Groveland Avenue,

22nd Street, and Fayette Street. All of these properties were covered by fire insurance.

However, when Olivia Anderson Jones followed Mrs. Ellerba to the witness stand, she not only testified to an admission made to her by appellant concerning the South Calhoun fire, but she also testified, *without objection,* that he informed her of being in business with Mr. Goldberg. The business, in the witness' words, was "with some kind of insurance, like these fire settings to collect the insurance." Later, Jones confirmed her earlier testimony that appellant had "set other fires" and proceeded to say that he told her that, in setting them, he had "let the oil out of the furnace."

Again in the testimony of Assistant State's Attorney Gersh, on redirect examination, it was brought out, *without objection,* that the appellant, Mr. Goldberg, and other individuals had a chain of ownership or title in real estate in Baltimore City and that "at various times they would have fires at these properties, and at some time the property would be in the name of Goldberg, yet the insurance was paid to Ellerba." Mr. Gersh also testified, *without objection,* that "[w]e couldn't determine any particular pattern of why one particular property would be signed one way and one another, but this was a common scheme threading through all of these properties."

Finally, Segeant Lioi of the Baltimore City Arson Squad gave extensive testimony, *without objection,* concerning appellant's statements made to him during the May 31 interrogation concerning other arsons in different areas of Baltimore City. Sergeant Lioi then explained, in detail, the method appellant described he used to start the fires, the amounts of money he had received in payment, and the location and dates of these other arsons. According to Lioi, six or seven fires were discussed specifically at that time although, he testified that there were other fires which appellant mentioned but could not remember clearly. The only objection interposed to the latter testimony was defense counsel's statement, "[o]bject to anything he couldn't remember."

In light of the absence of appropriate objections to the testimony by other witnesses of numerous other fires, this third assignment of error is not properly before us. Maryland Rule 1085. As Judge Prescott stated for the Court in *Forrester v. State,* 224 Md. 337, 344, 167 A. 2d 878 (1961), "[I]f we assume without deciding that the evidence was inadmissible, any objection to its admission was waived by its subsequent admission without objection."

## V

Appellant next assails the trial court's rulings on appellant's motions for severance and a separate trial on each indictment. The motion was made initially on the first day of trial, prior to the court's ruling on appellant's motion to suppress his May 31 statements. In making the motion, appellant's trial counsel characterized it as "very, very short" and cited *McKnight v. State,* 280 Md. 604, 375 A. 2d 551 (1977). He described *McKnight* as a "case concerning four successive armed robberies tried as one in one case." He further contended that the State, in the instant case, was committing the same error by trying "three [3] unrelated fires . . . as one . . . and I suggest it is highly prejudicial to the defendant. . . ." Counsel then submitted on the "arguments" contained in the *McKnight* case. To this, the State made a proffer that *"the means by which [the fires] were set were basically the same."* (Emphasis added.) When disposing of the motion for severance, following its disposition of the motion to suppress, the court stated without elaboration, "that severance is not legally required and, therefore, [the court] denies that motion."

Appellant's motion to sever was renewed at the conclusion of Captain John Richter's testimony. Richter, a member of the Fire Investigation Bureau of the Baltimore City Fire Department, was the State's expert witness concerning the South Calhoun Street fire. At a bench conference, defense counsel addressed the court with respect to the renewal of the motion as follows:

"Your Honor, at this time I'd like to renew my

---

3. As previously noted, the third indictment was *nol prossed.*

motion for severance of the two indictments. We've had two fire investigators testify and I see no similarity between the fires, and I suggest that trying the two indictments together places this defendant — It may well be the State may be able to prove that he was the owner of these dwellings — I am not so admitting that, it is possible — but other than that I see no other similarity that would cause these cases to be tried together other than the fact this defendant is charged, and at this time I renew my motion for severance."

The State's rejoinder and the court's ruling were as follows:

MR. SHOUP: "Your Honor, the State hasn't completed its case yet in order to tie them together, *and we intend to tie these fires together as to cause and as to ownership.* We're about halfway through.

THE COURT: I was just going to say that at this point I can't tell what they're going to do and what they're not going to do. Obviously, if they can't tie them together your point may be very well taken, but at this juncture, until they have completed their case to see whether they can tie them together, I can't rule on your motion other than to maintain my prior ruling.

MR. GITOMER: Yes, Your Honor." (Emphasis added.)

The motion was again renewed and denied at the close of the State's case, following denial by the court of appellant's motion for judgments of acquittal.

Severance is a matter which rests largely within the discretion of the trial court pursuant to the provisions of Maryland Rule 745(c).[4]

---

4. Rule 745(c) provides:

"If it appears that any party will be prejudiced by the joinder for trial of counts, charging documents or defendants, the court may, upon its own motion or the motion of any party, order separate trials of counts, charging documents or defendants, or grant any other relief justice requires."

As Judge Levine pointed out in *McKnight v. State,* 280 Md. 604 (1977), joinder of offenses may serve the ends of judicial economy but severance may be mandated when the prejudicial effect of the evidence of another crime outweighs its probative value. The ultimate test by which a motion for severance must be evaluated was stated in *McKnight* in the following terms:

"We think that a defendant charged with similar but unrelated offenses is entitled to a severance where he establishes that the evidence as to each individual offense would not be mutually admissible at separate trials."

*Id.* at 612.

In the instant appeal, it is apparent that the trial court, in the early stages of the trial, was at some disadvantage with respect to making disposition of the motion for severance, in these respects: (a) appellant, as the moving party, relied broadly upon the principles of *McKnight* without specific factual elaboration; and (b) the responses of the State to the motion when made and renewed certainly tended to indicate that the requirements of the *McKnight* rule would be satisfied. It was quite evident, however, when the motion was renewed at the close of the State's case, that the prosecution had failed to establish that "the means by which [the fires] were set were basically the same." It was then manifest that the ingenious "furnace method," utilizing the thermostat and exposed wires leading to flammable materials, was the cause of the Shirley Street fire. On the other hand, it was abundantly clear from the testimony of Captain Richter and Mrs. Anderson Jones that the so-called furnace method was not at all involved at the South Calhoun Street fire. Mrs. Anderson Jones, it will be recalled, testified that appellant had told her he had "dropped a match" after leaking oil from the furnace. It follows, therefore, that under the *McKnight* rule the evidence as to each individual offense would not be "mutually admissible" at separate trials.

We think it quite plain that had the evidence supported the early claims of the prosecution that the "means" were

basically the same, that is, that the same incendiary devices were utilized at each property, joinder would have been proper under the so-called "signature" or "handiwork" exceptions recognized by the Court of Appeals in *Ross v. State,* 276 Md. 664, 670, 350 A. 2d 680 (1976) and discussed in both the majority and dissenting opinions in *Lebedun v. State,* 283 Md. 257, 390 A. 2d 64 (1978). *See also Nasim v. State,* 34 Md. App. 65, 366 A. 2d 70 (1976). But this was not the situation. Neither is the "common scheme or plan" exception available. There was no testimony concerning any insurance claim with respect to the Shirley Street property loss; whereas there was rather extensive testimony by an insurance claims adjuster, by appellant's wife, and by Mrs. Anderson Jones concerning the insurance claim which was made and paid for the Calhoun Street fire.

It necessarily follows that there was reversible error when the court denied appellant's motion for a severance at the close of the State's case.

## VI

Appellant's final contentions are that the evidence was insufficient to support his arson convictions of 12 South Calhoun Street and of 2470 Shirley Avenue. We deem it necessary, in the light of the Double Jeopardy Clause of the Fifth Amendment, to address these contentions, notwithstanding our finding of reversible error on the severance issue. *Burks v. United States,* 98 S. Ct. 2141 (1978); *see State v. Boone,* 284 Md. 1, 12, 393 A. 2d 1361 (1978). *Compare United States v. Mandel,*[5] No. 77-2487 (4th Cir. filed Jan. 11, 1979).

The test as to the sufficiency of evidence in a criminal case is succinctly stated in *Metz v. State,* 9 Md. App. 15, 23, 262 A. 2d 331 (1970), as follows:

> "To be sufficient in law to justify a conviction, the admissible evidence adduced must show directly, or

_____

[5]. In the *Mandel* case, the United States Court of Appeals for the Fourth Circuit declined to pass upon the sufficiency of the evidence when, on appeal, "important evidence has been ruled to be inadmissible." It was held inappropriate to adjudge the sufficiency of "the balance of the evidence." That, of course, is not the situation presented here.

circumstantially, or support a rational inference of, the facts to be proved from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged."

We also have had occasion to explicate the burden imposed upon the State in an arson case and the elements of proof that are involved. Thus, in *Smith v. State,* 20 Md. App. 577, 596-97, 318 A. 2d 568 (1974), *cert. denied,* 420 U. S. 909 (1975), we stated:

"In a prosecution for arson as in other criminal cases, the State must prove the *corpus delicti, viz.,* burning with a criminal design. Not only must the fact of the fire be shown; it must also be established that it was willfully and maliciously set. The State must prove a criminal design beyond a reasonable doubt. Proof of the defendant's criminal agency, although essential for conviction, is not part of the *corpus delicti. Davis v. State,* 202 Md. 463, 97 A. 2d 303 (1953); *Bollinger v. State,* 208 Md. 298, 117 A. 2d 913 (1955); *McDowell v. State,* 231 Md. 205, 189 A. 2d 611 (1963); *Hughes v. State,* 6 Md. App. 389, 251 A. 2d 373 (1969). Other relevant rules of law in arson cases that may be encapsulated from the cases cited and their underlying authorities are these:

1. The character of the evidence to prove the *corpus delicti,* and its sufficiency for that purpose, depend largely upon the circumstances of each particular case; and the law recognizes that since a burning is almost invariably clandestine, the prosecution must usually depend upon circumstantial evidence.

2. An extrajudicial confession of guilt of arson uncorroborated by other evidence of the *corpus delicti* is not sufficient to warrant a conviction.

3. With respect to the nature and quantum of the

evidence needed to corroborate the extrajudicial confession:

> (a) Such evidence need not be full and positive, and may be circumstantial in nature when direct evidence is not available.
>
> (b) It need not establish by itself the ·truth of the *corpus delicti* beyond a reasonable doubt or by a preponderance of proof.
>
> (c) Any facts and circumstances that are substantial in nature and fortify the truth of the confession or statement are sufficient."

Applying these principles to the facts in the instant appeal, we find that the two fires are indeed a study in contrast. While we cannot find that the evidence was insufficient to sustain the conviction of the arson of Shirley Avenue, we conclude that the evidence was clearly insufficient to sustain the conviction of the arson of South Calhoun Street. The motion for judgment of acquittal under that indictment should, therefore, have been granted.

With reference to the Shirley Avenue fire, there was unequivocal expert testimony by Captain Hatoff of the Fire Investigation Bureau, Baltimore City Fire Department, that the fire was "incendiary in origin." Photographs were received in evidence illustrating the damage to the basement and upper floors caused by the fire. These photographs also included a picture of a five-gallon bucket that appeared to have contained a flammable paste. The expert witness, after hearing detailed testimony of appellant's unique method of setting other fires, heretofore described, unequivocally stated that the Shirley Avenue fire was caused by the same method. Furthermore, two fire officials placed appellant at the scene of the fire shortly after they arrived. As the Court of Appeals stated in *Bollinger v. State,* "[i]n arson cases, evidence that the accused was seen in the vicinity of the fire,

whether before or after it occurred, is always relevant." 208 Md. 298, 307, 117 A. 2d 913 (1955).

In comparison, it is plain from the evidence of record pertaining to the South Calhoun Street fire that while the State proved the fact of that fire, it failed to produce legally sufficient evidence that the fire was willfully or maliciously set. The State's only witness testifying to the *corpus delicti* of the South Calhoun Street fire was Captain Richter, also of the Fire Investigation Bureau of the Baltimore City Fire Department. On direct examination, Captain Richter, a fire department veteran with $35^1/_2$ years' experience, including 13 years in the Fire Investigation Bureau, was unable[i] to recall whether there was an oil burner in the basement. He indicated that it had been two years since he went to the scene of the fire, and in the interim he had investigated seven or eight hundred other fires. Captain Richter testified that the fire originated in the rear of the basement of the three-story dwelling but he was unable to determine anything further because at the time of his inspection all the debris had been moved outside the premises. However, he did state that he "saw the pattern on the wall where the fire had gone up the wall; also, where the fire had burned on the floor it was dark and an altogether different color than the rest of the flooring.... [T]he underside of the flooring and the [first floor] floor joists were burnt directly above [the] dark area in the basement where the fire had originated." The fire, contained in the basement, had caused no damage to the floors other than smoke damage. Asked why he did not take any photographs, Captain Richter responded:

> "Because at this particular fire I didn't take any photographs because the only thing was left in the basement was the walls and the ceiling that was above, and nothing—*I had no information as to any flamables [sic]. I could not say whether a flamable [sic] or not was used, because the debris was moved to the outside.* So for that particular reason I didn't take any—have any pictures or photographs taken of this particular area." (Emphasis added.)

Interrogated further on direct examination as to the implications of his failure to smell any flammable materials or see any evidence of flammable materials, the Captain stated: "Well, it would indicate to me that there was no flammable used but it still would not indicate to me that somebody could have set the fire." While it is possible that the word "not" in the last portion of the above quotation was inadvertently omitted by the reporter between the words "could" and "have," this is far from a positive affirmation that the fire was incendiary in origin—the precise and unequivocal opinion given by the expert witness who testified with respect to the Shirley Street fire. In addition, as previously stated, there is no evidence here that the unique method or so-called "signature" employed in the Shirley Street arson and the other fires set by appellant, was employed at South Calhoun Street. Furthermore, the statement attributed to appellant by Mrs. Anderson Jones, that appellant had "dropped a match," viewed as an extrajudicial admission of guilt of arson, is insufficient to warrant a conviction unless corroborated by other evidence of the *corpus delicti. See Smith v. State,* 20 Md. App. at 597. Here, the record does not contain sufficient corroborative evidence that the fire was willfully and maliciously set. We think, therefore, the trial court should have granted appellant's motion for a judgment of acquittal as to the arson of 12 South Calhoun Street. *Barry v. State,* 166 Tex. Crim. 372, 314 S.W.2d 90 (1958). The judgment of conviction under that indictment must be reversed. *State v. Boone, supra.*

> *Judgment under Indictment No. 17714453 (2740 Shirley Avenue) reversed and cause remanded for a new trial.*
>
> *Judgment under Indictment No. 17714451 (12 South Calhoun Street) reversed.*
>
> *Costs to be paid by the Mayor and City Council of Baltimore.*